## AFFIDAVIT OF GREGORY BROWN

I, Detective Gregory Brown, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND BACKGROUND

1. I am a Detective with the Boston Police Department ("BPD") where I have worked for over 30 years. I am currently assigned to BPD's Special Investigations Unit ("SIU"), where I have worked for over 10 years.[1] SIU is a citywide unit made up of Detectives and other investigators who regularly work with units throughout BPD and as sworn Task Force Officers ("TFO") with federal investigative agencies such as the Federal Bureau of Investigation ("FBI") investigating drug, firearm, racketeering and other crimes being committed by street gangs and other criminal organizations operating in and around the City of Boston.

2. During my tenure at BPD, I have been involved in investigations relating to a wide variety of suspected criminal activity, including the illegal distribution of narcotics, firearms-related offenses and violent crimes. Since March 2016, I have participated in joint operations with the FBI investigating drug and firearm trafficking in and around the City of Boston.

3. I have received training in enforcement and investigation of firearm and narcotics cases. I have conducted and participated in investigations involving the violation of both the federal drug and firearms laws, including 18 U.S.C. § 922(g)(1) -- being a felon in possession of a firearm or ammunition, and 21 U.S.C. §§ 841 and 846 -- illegal distribution and possession with

---

[1] Prior to my assignment to SIU, I was an investigator in the Youth Violence Strike Force ("YVSF") from 1995 to 2007 and I was assigned to the Anti- Gang Violence Unit from March 1993 to May 1995. My primary duties as an investigator in these units were to identify Boston based street gangs, document their membership and gather intelligence relative to gang activity. I also worked in partnerships with other law enforcement and community based agencies to initiate procedures to disrupt the organizational structure and reduce the criminal activities of these gangs.

1

intent to distribute controlled substances and conspiracy to distribute and possession with intent to distribute controlled substances.

4. I have participated in the investigation described in detail below. During it, I have conducted surveillance, provided intelligence and participated in the preparation and debriefing of the cooperating witness used to purchase drugs. I have reviewed reports prepared by other investigators, and discussed individual investigations with other FBI and BPD investigators. Because of my personal participation in these investigations, my conversations with other law enforcement officers, and review of reports prepared by other officers, I am familiar with them. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and accompanying arrest warrant and does not set forth all of my knowledge about this matter.

5. Based on my training and experience, I know that it is a violation of 21 U.S.C. §§ 841(a)(1) and 846 for a person to conspire with other persons known and unknown, to knowingly and intentionally distribute, and to possess with intent to distribute heroin, a Schedule I controlled substance, cocaine, a Schedule II controlled substance, and cocaine base, a Schedule II controlled substance. As set forth below, there is probable cause to believe that from a time unknown continuing in or about January 2018, at Boston, and elsewhere in the District of Massachusetts, and at other places presently unknown, Abdul-Karim MUWAKKIL, a/k/a "Tyrone Jones," and a/k/a "Ty," violated 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(i) and 846 by conspiring with other persons known and unknown, to knowingly and intentionally distribute, and to possess with intent to distribute, 100 grams and more of a mixture and substance containing a detectible amount of heroin, a Schedule I controlled substance, cocaine, a Schedule II controlled substance, and cocaine

2

base, a Schedule II controlled substance.

6. In July 2017, a cooperating witness ("CW-1"),[2] informed investigators that CW-1 owed a $2000 drug debt to a local drug dealer (the "Local Drug Dealer") and that CW-1 could purchase controlled substances from this individual if investigators could assist in paying off the $2000 debt. Investigators agreed to repay the debt. On July 8, 2017, CW-1 received a phone call from an individual known to me at approximately 12:11 p.m., and was told to expect a call from "Ty." "Ty" was described as the Local Drug Dealer's right hand man. One minute later CW-1 received a text message from 617-602-2561 (the "MUWAKKIL Phone #1") that read, "Hit me." CW-1 placed a call to the MUWAKKIL Phone 1. During the conversation, "Ty" and CW-1 discussed repayment of the $2000 debt. Over the next month, CW-1 placed several calls to both "Ty" and the Local Drug Dealer in an attempt to pay off the $2000 debt. On August 11, 2017, CW-1 met with the Local Drug Dealer, and repaid the $2000 debt.

7. "Ty" was later identified as Abdul-Karim MUWAKKIL, a/k/a "Tyrone Jones" and "Ty" ("MUWAKKIL"), date of birth XX/XX/1981, a thirty seven year old male who resides at 85 Stoughton Street, Dorchester, MA ("85 Stoughton Street"). A check of the Massachusetts Board of Probation and Interstate Identification Index indicates MUWAKKIL has a criminal history including open cases for firearms violations, resisting arrest, motor vehicle violations, receiving stolen property, and domestic violence (2017), and a youthful offender conviction for armed robbery for which he was sentenced from 12 to 15 years in state prison (1998). CW-1 later

---

[2] CW-1 began cooperating with law enforcement in March 2016. CW-1 has a criminal history including arrests for firearms offenses, drug offenses, larceny offenses, and crimes of violence. I consider the information provided by CW-1 to be reliable. CW-1 is cooperating with law enforcement to receive financial compensation.

3

identified a sanitized photograph in the name of "Abdul-Karim Muwakkil," date of birth XX/XX/1981, from the Registry of Motor Vehicles, as the individual CW-1 knew as "Ty."

8. From August 2017, through January 2018, CW-1 conducted twelve (12) controlled purchases of heroin, cocaine and/or cocaine base, and one firearm from MUWAKKIL. Before each transaction, CW-1 initiated contact by calling or texting MUWAKKIL on cellular telephone numbers previously provided to CW-1 and negotiated the purchase of the various controlled substance. Whenever possible, these calls and texts were consensually recorded and/or monitored by the FBI. Once the amount of the drugs, the price, and the meet location was established, CW-1's vehicle and person were searched, CW-1 was provided with a transmitter, audio and/or video recording equipment, and Official Advance Funds ("OAF") with which to make drug purchases, and surveilled to the meet location. Whenever possible, conversations that took place during the buys were monitored as they took place using a transmitter. Once the buy was completed, CW-1 was surveilled back to a predetermined meeting location and turned over any purchased drugs or remaining funds, the recording equipment and transmitter, was searched a second time, and debriefed. Drugs obtained were thereafter inspected, field tested when possible, and processed into evidence so that they could be sent to the Northeast Regional Laboratory for further testing.

*A.     August 17, 2016 Controlled Purchase*

9. On August 17, 2017, CW-1 was contacted by MUWAKKIL and agreed to meet at 12:00 p.m. in Dorchester, MA. Investigators established surveillance near Blue Hill Avenue in Dorchester, and at approximately 12:04 p.m., observed a white Mercedes bearing Massachusetts registration 3ZWP20, registered to MUWAKKIL, arrive. MUWAKKIL, arrived wearing camouflage pants and a white shirt, and entered CW-1's vehicle. MUWAKKIL and CW-1

discussed forming a relationship to buy and sell drugs, with MUWAKKIL agreeing to sell CW-1 heroin in ten (10) gram packages at a rate of $500 as CW-1 needed. MUWAKKIL also told CW-1 that he may be busy at times, but if he ever needed to send a third party to meet with CW-1, it should be considered as if CW-1 was making the transaction with MUWAKKIL himself. At approximately 12:31 p.m., MUWAKKIL and CW-1 exited the vehicle.

10. At approximately 3:12 p.m., CW-1 placed a telephone call to MUWAKKIL over the MUWAKKIL Phone #1 and arranged to purchase 10 grams of heroin for $500.00. At approximately 3:36 p.m., CW-1 received a telephone call from an individual known to CW-1 as "Cap," who stated that MUWAKKIL instructed him to meet with CW-1 and complete the drug transaction with the understanding that CW-1 could pay $500 for the heroin at a later date.[3] "Cap" met with CW-1's on Blue Hill Avenue, Boston, at approximately 3:29 p.m. in a grey sport utility vehicle ("SUV"). CW-1 approached the driver's side of the SUV, and Cap passed CW-1 three of four packages of heroin he held in his hand. CW-1 indicated to agents that "Cap" was a black male with a rag on his head, and approximately 45 years old. Investigators were able to identify "Cap" as Tony D. Smith.

11. Following the transaction, CW-1 proceeded to a predetermined location and turned over the bags of suspected heroin. Testing at the New England Field Division laboratory revealed that the substance contained heroin and weighed 9.002 grams.

**B.**   ***August 22, 2017 Controlled Purchase***

---

[3] This arrangement is commonly referred to as "cuffing." "Cuffing" means providing narcotics upfront and then paying for them after they have been re-sold, presumably when the customer comes to purchase additional narcotics. Some drug dealers prefer this arrangement because it ensures the customer, who is always in debt, will always return.

12.     On August 22, 2017, CW-1 advised agents that CW-1 had had a conversation with MUWAKKIL on the MUWAKKIL Phone #1 via text message, and arranged to purchase ten (10) grams of heroin and repay $500 from the previous purchase. MUWAKKIL and CW-1 agreed to meet at 1:30 p.m. near Blue Hill Avenue and Lawrence Avenue, Dorchester, the same location they had met previously on August 17, 2017.

13.     CW-1 arrived at Blue Hill Avenue and Lawrence Avenue, and called MUWAKKIL who stated that he would be about an hour, and to look out for a white car. At approximately 3:16 p.m., investigators watched CW-1 walk down Lawrence Avenue, and get into a white Buick Lacrosse bearing MA registration 7GZ661, registered to MUWAKKIL (the "Buick"), with a black female passenger, later identified as Marisa Smith, and her daughter. Once in the car, Smith removed heroin from her purse and handed it to CW-1 in exchange for the $500 OAF, which she then put in her purse. After the transaction, CW-1 exited the vehicle.

14.     Following the transaction, CW-1 proceeded to a predetermined location and turned over the bags of suspected heroin. Testing at the New England Field Division laboratory revealed that the substance contained heroin and weighed 9.787 grams.

C.   *August 29, 2017 Controlled Purchase*

15.     On August 29, 2017, CW-1 exchanged text messages with MUWAKKIL over the MUWAKKIL Phone #1, agreeing to meet at approximately 2:00 p.m. at 45 Iflley Road, Jamaica Plain, MA ("45 Iffley Road") to purchase (10) grams of heroin and repay the $500 from the previous purchase.

16.     CW-1 arrived at 45 Iffley Road, and called MUWAKKIL via the building's communication box and was buzzed up to the third floor. Investigators observed the Buick parked

in the building's driveway. Once inside, CW-1 observed Marisa Smith in the apartment with MUWAKKIL. CW-1 and MUWAKKIL sat at a table and CW-1 passed him $500 OAF. MUWAKKIL pulled a bag of heroin from his pocket and handed it to CW-1. CW-1 and MUWAKKIL discussed potential future cocaine and firearm transactions and then CW-1 exited the building.

17. Following the transaction, CW-1 proceeded to a predetermined location and turned over the bags of suspected heroin. Testing at the New England Field Division laboratory revealed that the substance contained heroin and weighed 9.843 grams.

**D.**    *September 6, 2017 Controlled Purchase*

18. On September 6, 2017, CW-1 received a phone call from MUWAKKIL using the MUAKKIL Phone #1, instructing CW-1 to meet him at 85 Stoughton Street to purchase 10 grams of heroin and repay the $500 from the previous purchase.

19. CW-1 arrived at 85 Stoughton Street, and called MUWAKKIL to tell him CW-1 was at the door. MUWAKKIL met CW-1 in the hallway of the building handing over a package of heroin in exchange for $500 OAF. MUWAKKIL then discussed potential future cocaine transactions with CW-1. CW-1 exited the building.

20. Following the transaction, CW-1 proceeded to a predetermined location and turned over the bags of suspected heroin. Testing at the New England Field Division laboratory revealed that the substance contained heroin and weighed 9.442 grams.

**E.**    *September 27, 2017 Controlled Purchase*

21. On September 27, 2017, CW-1 advised agents that the previous day she/he had placed a consensually recorded phone call to MUWAKKIL over 617-405-0121, (the

"MUWAKKIL Phone #2") and agreed to meet him to purchase ten (10) grams of heroin and twenty-eight (28) grams of cocaine base (commonly referred to as "crack") for $1250, and repay the $500 from the previous purchase. At approximately 3:40 p.m., CW-1 made a consensually recorded phone call to MUWAKKIL informing him that she/he was on her/his way.

22. CW-1 arrived at 85 Stoughton Street, rang the bell, and was buzzed into the building. CW-1 entered MUWAKKIL's apartment and observed Marisa Smith, MUWAKKIL's mother, and a male known to CW-1 as "Kevin." "Kevin" was later identified by investigators as Kevin Lewis. MUWAKKIL then discussed a shooting.

23. CW-1 provided MUWAKKIL with the $1750 OAF. MUWAKKIL then handed CW-1 heroin that was already in his hand, went into the living room, and gave CW-1 cocaine base that he took off a scale. CW-1 asked MUWAKKIL if he could sell CW-1 a gun, and MUWAKKIL responded that he would see if he could get one. At approximately 4:30 p.m., CW-1 exited the building.

24. Following the transaction, CW-1 proceeded to a predetermined location and turned over the bags of suspected heroin and cocaine base. Testing at the New England Field Division laboratory revealed that the suspected heroin contained heroin and weighed 9.479 grams, and the suspected cocaine base contained cocaine base and weighed 24.446 grams.

*F.     October 5, 2017 Controlled Purchase*

25. On October 4, 2017, CW-1 spoke with MUWAKKIL on the MUWAKKIL Phone #2 and agreed to meet at approximately 12:00 p.m. on October 5, 2017, at 85 Stoughton Street to purchase twenty-eight (28) grams of cocaine base for $1250 and repay the $500 for a previous heroin purchase.

8

26.     While in route to 85 Stoughton Street, CW-1 placed a call to MUWAKKIL on the MUWAKKIL Phone #2, who instructed CW-1 to go to 125 Rosseter Street, Boston, MA ("125 Rosseter Street"). Investigators followed CW-1 to the area of 125 Rosseter Street. Once CW-1 arrived at 125 Rosseter Street, CW-1 went to the porch of the building and placed a phone call to MUWAKKIL, who instructed CW-1 to go to the second floor of the building. Upon entering the apartment, CW-1 observed an unknown black female, and saw an insulated "lunch bag," that CW-1 recognized as the bag in which MUWAKKIL carries his drugs and paraphernalia. CW-1 handed MUWAKKIL $1750 OAF. MUWAKKIL then pulled the cocaine base from the bag and handed it to CW-1. MUWAKKIL then stated that he would be receiving a number of guns shortly, and offered to sell one to CW-1 for $750 or less. After the transaction, CW-1 exited the building.

27.     Following the transaction, CW-1 proceeded to a predetermined location and turned over the bag of suspected cocaine base. Testing at the New England Field Division laboratory revealed that the substance contained cocaine base and weighed 25.217 grams.

### G.     *October 13, 2017 Controlled Purchase*

28.     On October 12, 2017, CW-1 placed a consensually recorded phone call to MUWAKKIL using the MUWAKKIL Phone #2, who instructed CW-1 that they would meet the next day "where he had his slippers on." This was understood by CW-1 to mean that they would meet at 85 Stoughton Street in Dorchester. On October 13, 2017, CW-1 placed a consensually recorded phone call to MUWAKKIL on the MUWAKKIL Phone #2 who agreed to sell CW-1 ten (10) grams of heroin and twenty-eight (28) grams of cocaine base to CW-1 for $1250. Investigators gave CW-1 $1250 in OAF with the expectation that the ten (10) grams of heroin

Case 1:18-mj-02468-MBB Document 4-1 Filed 08/16/18 Page 10 of 16

would be "cuffed."

29. Once CW-1 arrived at 85 Stoughton Street, CW-1 rang the bell and was buzzed into the building. CW-1 met Kevin Lewis at the top of the stairs, and was handed heroin and cocaine in exchange for $1250 OAF. CW-1 returned to CW-1's vehicle and noticed that CW-1 had been given the wrong amount of heroin, and cocaine powder in place of the cocaine base that was expected. Investigators instructed CW-1 to reenter 85 Stoughton Street to correct the order. CW-1 returned to the building and was buzzed up to the apartment. Lewis let CW-1 into the apartment, where CW-1 observed MUWAKKIL's mother and an unknown black male smoking marijuana. CW-1 informed Lewis that CW-1 was supposed to receive ten (10) grams of heroin. Lewis went into the room where the other individuals were smoking, and returned with a clear plastic bag with approximately one hundred (100) grams of cocaine powder, and CW-1 told him that CW-1 was supposed to get crack cocaine, not cocaine powder. Lewis returned to the other room and came back with a second clear plastic bag that appeared to contain approximately one hundred (100) grams of cocaine powder as well. Lewis made a third trip to the room and returned with a clear plastic bag that appeared to contain approximately 125 grams of heroin. Lewis weighed out ten (10) grams of the heroin and gave it to CW-1. CW-1 returned to her/his vehicle and placed a consensually recorded phone call to MUWAKKIL who stated that the cocaine substance LEWIS had given CW-1 was crack, not cocaine powder. CW-1 left the area.

30. Following the transaction, CW-1 proceeded to a predetermined location and turned over the bag of suspected heroin and cocaine base. Testing at the New England Field Division laboratory revealed that the suspected heroin contained heroin and weighed 9.716 grams and the suspected cocaine base contained cocaine base and weighed 25.702 grams.

10

### *H.    October 19, 2017 Controlled Purchase*

31.    On October 19, 2017, at approximately 11:30 a.m., CW-1 placed a phone call to MUWAKKIL using the MUWAKKIL Phone #2, who instructed CW-1 to meet him at the "same place," and that he would sell CW-1 ten (10) grams of heroin and twenty eight (28) grams of cocaine for $1250, and be repaid the $500 from a previous purchase. This was understood by CW-1 to refer to 85 Stoughton Street.

32.    CW-1 arrived at 85 Stoughton Street, and placed a phone call to MUWAKKIL who instructed CW-1 to ring the bell to the apartment. CW-1 then rang bell number "3" and was buzzed into the building. CW-1 met MUWAKKIL at the top of the stairs, was led into the apartment and observed an unknown black male mixing a substance that CW-1 believed to be either heroin or cocaine. CW-1 followed MUWAKKIL into the living room and gave him $1750 OAF in exchange for heroin and cocaine powder that MUWAKKIL held in his hand. MUWAKKIL told CW-1 that he was still waiting to receive the guns he had offered to sell CW-1, and said that he would sell a 9mm handgun for between $800 and $1000.[4] After the transaction, CW-1 exited the building.

33.    Following the transaction, CW-1 proceeded to a predetermined location and turned over the bag of suspected heroin and cocaine. Testing at the New England Field Division laboratory revealed that the suspected heroin contained heroin and weighed 9.878 grams and the suspected cocaine contained cocaine and weighed 25.582 grams.

---

[4]    On November 8, 2017, MUWAKKIL sold CW-1 one (1) loaded Beretta .40 caliber handgun containing seven (7) rounds of ammunition. This sale is not the subject of this Complaint.

11

### I.    *November 3, 2017 Controlled Purchase*

34.     On November 2, 2017, CW-1 spoke to MUWAKKIL using the MUWAKKIL Phone #2, agreeing to meet the following day to purchase twenty (20) grams of heroin for $1000.

35.     CW-1 arrived at 85 Stoughton Street, and rang the doorbell to MUWAKKIL's apartment. At approximately 11:37 a.m., MUWAKKIL called CW-1 and stated he was about fifteen minutes away. MUWAKKIL arrived at 85 Stoughton Street at approximately 12:16 p.m. in an "Uber" style cab service. MUWAKKIL met with CW-1 in the driveway on the side of 85 Stoughton Street and entered the building via a porch on the back of the building. MUWAKKIL removed a clear plastic bag containing what CW-1 believed was approximately thirty (30) grams of heroin from the crotch area of his pants, and handed CW-1 what appeared to be twenty (20) grams in exchange for the $1000 OAF. MUWAKKIL told CW-1 that he possessed a few kilograms of cocaine, and would sell one to CW-1 for $36,000. MUWAKKIL said that CW-1 might be able to get a lower price from his supplier. CW-1 exited the building.

36.     Following the transaction, CW-1 proceeded to a predetermined location and turned over the bag of suspected heroin. Testing at the New England Field Division laboratory revealed that the substance contained heroin and weighed 19.113 grams.

### J.    *November 24, 2017 Controlled Purchase*

37.     On November 24, 2017, CW-1 made a phone call to MUWAKKIL using the MUWAKKIL Phone #2 and arranged to purchase ten (10) grams of heroin and repay the $500 for a previous purchase. MUWAKKIL agreed to meet CW-1 at 4:00 p.m. at 85 Stoughton Street.

38.     CW-1 arrived at 85 Stoughton Street, rang the doorbell, spoke briefly with an unknown male, and return to CW-1's vehicle. CW-1 placed a phone call to MUWAKKIL, who

12

told CW-1 to wait in the car and that he would be there soon. At approximately 4:19 p.m., investigators observed Kevin Lewis interact with an unknown male subject, who then left the area in a blue E250 van bearing MA registration 4BA892, registered to Tara Harris (the "Van"). The Van returned to the area approximately twenty minutes later. From approximately 4:25 p.m. to 5:14 p.m., CW-1 placed a series of phone calls to MUWAKKIL asking when he would arrive. In the last of these calls, MUWAKKIL told CW-1 that he had just pulled into the parking lot. CW-1 entered 85 Stoughton Street and CW-1 observed three unknown males, including one later identified by investigators as Stacy Harris. MUWAKKIL went into the kitchen and returned with a bag, and confirmed that CW-1 wanted ten (10) grams of heroin. MUWAKKIL then gave CW-1 the heroin in exchange for $500 OAF. As CW-1 was leaving, CW-1 observed MUWAKKIL give five (5) grams of heroin to Stacy Harris on the back porch of 85 Stoughton Street. CW-1 then exited the building and drove away.

39. Following the transaction, CW-1 proceeded to a predetermined location and turned over the bag of suspected heroin. Investigators field tested the suspected heroin and received a positive result for inositol and an inconclusive result for heroin.5 Further testing at the New England Field Division laboratory is pending.

*K. December 10, 2018 Controlled Purchase*

40. On December 9, 2017, CW-1 spoke to MUWAKKIL on the MUWAKKIL Phone #2 and arranged to purchase another twenty (20) grams of heroin for $1000. On December 10,

---

5 I am aware that inositol is a substance commonly used for "cutting" or diluting narcotics such as heroin, cocaine base, and cocaine so that the seller can stretch the product further and make more money.

13

2017 at approximately 12:46 p.m., CW-1 called MUWAKKIL, and arranged to meet at 85 Stoughton Street in approximately one hour.

41.  MUWAKKIL entered 85 Stoughton Street carrying a white CVS bag at approximately 2:43 p.m., and CW-1 entered the building approximately five minutes later. CW-1 followed MUWAKKIL into the living room and handed him $1000 OAF in exchange for two bags of heroin. MUWAKKIL and CW-1 exited the building, entered CW-1's vehicle and left the area. At approximately 4:15 p.m., CW-1 dropped MUWAKKIL back off at 85 Stoughton Street and drove away.

42.  Following the transaction, CW-1 proceeded to a predetermined location and turned over the bag of suspected heroin. Investigators field tested the suspected heroin and received a positive result for inositol and an inconclusive result for heroin. Further testing at the New England Field Division laboratory is pending.

*L.  January 12, 2018 Controlled Buy*

43.  On January 11, 2018, CW-1 placed telephone call to MUWAKKIL on the MUWAKKIL Phone #2, and asked MUWAKKIL if the two could meet the next day at 12:00 p.m. so that CW-1 could purchase ten (10) grams of heroin and repay the $500 for a previous purchase. On January 12, 2018, CW-1 called MUWAKKIL confirming the 12:00 p.m. transaction.

44.  At approximately 12:09 p.m., CW-1 called MUWAKKIL asking if he was at the location, and confirmed the ten (10) grams of heroin purchase. CW-1 then entered 85 Stoughton Street and observed MUWAKKIL's mother, Kevin Lewis, and a child inside the apartment. CW-1 handed MUWAKKIL $500 and observed him retrieve heroin from behind the door of a closet. MUWAKKIL asked CW-1 to follow him into a bathroom, where he measured heroin out of a

larger bag containing what CW-1 believed to be approximately fifty (50) grams of heroin. After measuring, MUWAKKIL told CW-1 that he had given CW-1 an "extra two," understood by CW-1 to mean that CW-1 was given twelve (12) grams of heroin. MUWAKKIL discussed recent shootings with CW-1. CW-1 then exited the building.

45. Following the transaction, CW-1 proceeded to a predetermined location and turned over the bag of suspected heroin. Investigators field tested the suspected heroin and received a positive result for inositol. Further testing at the New England Field Division laboratory is pending.

46. Based on the above, I believe probable cause exists that from a time unknown

continuing in or about January 2018, at Boston, and elsewhere in the District of Massachusetts, and at other places presently unknown, Abdul-Karim MUWAKKIL, a/k/a "Tyrone Jones," and a/k/a "Ty," violated 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(i) and 846 by conspiring with other persons known and unknown, to knowingly and intentionally distribute, and to possess with intent to distribute, 100 grams and more of a mixture and substance containing a detectible amount of heroin, a Schedule I controlled substance, cocaine, a Schedule II controlled substance, and cocaine base, a Schedule II controlled substance.

Detective Gregory Brown
Boston Police Department,
Special Investigations Unit

Subscribed and sworn to before me this 16th day of August 2018.

HON. MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE